UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION

Mark James Savoy                                             Civil Action No. 08-0232

versus                                                       Judge Tucker L. Melançon

St. Landry Parish Council, et al                             Magistrate Judge Methvin

**MEMORANDUM RULING**

Before the Court are a Motion for Summary Judgment filed by defendants, Sheriff Bobby Guidroz, Warden Calvin Moore and Tammy Prudhomme, individually and in their official capacities [Rec. Doc. 108] and plaintiff Mark James Savoy's "proposed" opposition thereto [Rec. Doc. 120]. Also before the Court are plaintiff's Motion To Extend Time to file his response [Rec. Doc. 122] and defendants' Motion To Strike plaintiff's proposed opposition [Rec. Doc. 125]. For the following reasons, plaintiff's Motion To Extend Time will be granted, defendants' Motion To Strike will be denied, and defendants' Motion for Summary Judgment will be granted.

*I. Background*

This case involves an incident in which plaintiff, Mark James Savoy, jumped from the Basin Bridge on Highway I-10 in Louisiana after he allegedly kidnaped his wife and two minor children. *R. 112, 116.* At the time of the incident plaintiff was a resident of Eunice, Louisiana, where the alleged kidnaping occurred. Plaintiff was arrested by the City of Eunice police officers on January 14, 2007. During the arrest plaintiff alleges he was beaten by Eunice police officers and taken to Iberia General Hospital. Plaintiff's hospital notes

1

indicate that a facial CT was performed and he was diagnosed with a non-displaced nasal contusion/fracture. *R. 120, Exh. 4*. The attending physician prescribed topical medication to the nose and Tylenol and instructed that plaintiff be rechecked by the Eunice City Jail medical personnel with a follow-up by an ENT [Ear, Nose and Throat] at a later date. *Id.*

On January 19, 2007, plaintiff was transferred to the custody of Sheriff Bobby Guidroz and transported to the St. Landry Parish Jail ("the Jail") on charges of aggravated kidnaping, attempted escape, warrant arrest and violation of protective orders. *R. 103*. Defendant Calvin Moore is the Warden of the Jail.

A medical preliminary health screening performed on plaintiff on the date of transfer, January 19, 2007, indicated that he had a "laceration to inner lip" and a "sore" on his nose. *R. 120, Exh. 4*. On that day, plaintiff filed a Request for Medical Attention for a laceration on the right side of his inner lip and Dr. Derek Metoyer, the Jail physician, prescribed medication and hydrogen peroxide mouth wash. On or about February 18, 2007, while incarcerated at the Jail, plaintiff was attacked by another inmate. *Id.* Following the altercation, plaintiff was placed in "protective custody" where he retained all of his privileges other than being able to be in the day room with the other prisoners. *R. 108, Depo. of Moore, pp. 16, 21*.

Plaintiff requested medical attention on February 20 for a "sprung [sic] ankle" with swelling and bruising, as well as for pain related to his hand, elbow and ears. *R. 108, St. Landry Parish Jail Record, Bates No. 8*. On February 22, he again requested medical attention for swelling in his ankle and his wrist. *Id. at 9*. Dr. Metoyer examined plaintiff the next day, February 23, and performed x-rays of his hand and ankle. *Id*. While plaintiff's

hand x-ray was normal, the x-ray of his ankle revealed a small fracture. *Id. at 11,12*. Dr. Metoyer considered the injury to be "minor" and prescribed 600 mg Ibuprofen for pain. In plaintiff's March 1 follow-up examination, Dr. Metoyer noted that the ankle injury was improving and continued plaintiff's prescription of Ibuprofen for pain. In a March 4 examining Dr. Metoyer diagnosed right thumb pain and left ankle pain/fracture and prescribed 600mg Ibuprofen every 6 to 8 hours for pain. *Id. at 14*. Plaintiff again requested medical attention on March 5, complaining of ankle and hand pain and "jaw cracking." *Id. at 17*. On March 8, 2009 plaintiff was prescribed 600 mg Ibuprofen to be administered at 7 A.M. and 9 P.M. *Id.* The record contains medication logs indicating that plaintiff was given the prescribed Ibuprofen from March 8 through May 1. *Id. at 47-56, 70*.

Savoy was notified by University Medical Center ("UMC") that he was scheduled to see an orthopaedic surgeon on April 4 for his ankle fracture.[1] *Id. at 23*. The record indicates, however, that on April 4, 2007 at 9:05, the Jail R.N., Pam Whittington, cancelled the appointment because plaintiff's paperwork was incomplete.[2] *Id. at 23, 24*. Whittington's documentation states, "UMC to reschedule appointment and send notification letter." *Id. at 24*. Sometime thereafter, but by April 23, UMC submitted a notice that plaintiff's appointment was rescheduled for April 25.[3] *Id. at 25*. The record provides that on April 23, 2007, at 2:55 p.m., Whittington cancelled plaintiff's appointment because Warden Moore

---

[1] While the record does not indicate the date UMC provided the appointment notice, the notice indicates "032807," which the Court construes as the date the notice was created.

[2] The record does not indicate who was responsible for the incomplete paperwork.

[3] The UMC appointment notice indicates "041107."

had ordered that no appointments were to be scheduled on that date. *Id.* The record further indicates that a new appointment date was to be mailed to the Jail by UMC. *Id.*

On May 2, the nurse submitted a request for plaintiff to be transported to Opelousas General Hospital to receive medical attention for a laceration below the left eye which was secondary to a fight. *Id. at 29.* The Hospital record indicates that Savoy received 5 sutures on that day and was instructed to follow head injury precautions, clean the site and apply Neosporin ointment until the sutures were removed on May 8, 2007. *Id. at 30.* A May 2 Memo from Whittington instructed plaintiff's jailers of the hospital orders with specifics on observing Savoy in light of the head injury precautions. *Id. at 42.*

On May 31, plaintiff requested medical attention for a mouth ulcer and questioned why his appointment with the orthopedic surgeon at UMC had not been rescheduled. *Id. at 46.* That day, an LPN prescribed "Orajel" for plaintiff's ulcer and explained to plaintiff that "he was not to know" the date of his appointment.[4] *Id.* On June 15 and July 5, the record indicates that plaintiff's Ibuprofen was refilled and one refill remained. *Id at 50, 54.*

On September 10, plaintiff's request for medical attention stated that he did not receive his medication for the last three (3) days and wanted to know "what [was] going on." *Id. at 58.* The next day, September 11, the Jail LPN, Tammy Prudhomme, advised plaintiff that his Ibuprofen prescription had expired and that she had submitted his request to see Dr. Metoyer. *Id.* Also, Prudhomme told plaintiff that she would continue to try and contact UMC for a follow-up appointment "which wasn't done per UMC." *Id.* The record includes

---

[4] Defendants represent that "the inmate was unaware that he had a scheduled hospital visit due to security reasons." *R. 105-4, p. 27.*

a September 12 letter to plaintiff from Whittington, copying Warden Moore, informing Savoy that his Ibuprofen had ceased because he had no more refills and that he had been placed on Dr. Metoyer's list to be examined. *Id. 60*. The next day, September 13, plaintiff was examined by Dr. Metoyer who found that his "ankle appear[ed] to be doing well" and prescribed "ES [Extra Strength] Tylenol" for plaintiff's complaints of pain. *Id. at 61*. The medical notes also state that on September 13, Whittington telephoned UMC and made an appointment with the orthopedic surgeon for September 19, 2007. *Id. at 57*. Whittington's note states that the UMC representative, Chad, told her that he never received a follow-up appointment notice for the April 25, 2007 appointment that had to be rescheduled.[5] *Id.* Plaintiff was examined at UMC on September 13, and x-rays were taken of his left ankle. *Id. at 66*. The record indicates that no fracture or dislocation was noted and plaintiff was prescribed ice and elevation for swelling. *Id.*

Thereafter, on September 26, plaintiff continued to complain of ankle pain and requested that he be seen by a doctor. *Id. at 69*. On September 29, Dr. Metoyer examined plaintiff's ankle, found he had full range of motion and prescribed 400 mg Ibuprofen for 2 weeks. *Id. 69; 71*. On October 16, plaintiff again complained that he had not received his medication, to which Prudhomme responded on October 18 that his prescription from Dr. Metoyer had expired. *Id. at 72*. The medical records contain no additional entries related to plaintiff's incarceration following Prudhomme's October 18 response.

Plaintiff filed this action on February 15, 2008 alleging that defendants acted with

---

[5] The record provides that on April 25, UMC instructed Whittington that it would reschedule plaintiff's follow-up appointment and send a notification letter to the Jail providing the date. *Id. at 25*.

5

deliberate indifference regarding plaintiff's medical treatment and safety while he was incarcerated at the St. Landry Parish Jail, and that defendants implemented policies which contributed to the failure to provide adequate medical treatment.

On September 25, 2008, approximately ten months after plaintiff's release from the Jail[6], plaintiff was examined by Dr. Christopher Gaffga, a board certified ear, nose and throat specialist. *R. 108, Depo. of Dr. Gaffga.* At that time Dr. Gaffga found a "very small external nasal deviation to the right" and a very mild right upper lip asymmetry which was not significant enough for him to recommend repair. *Id. at p. 12*. Dr. Gaffga performed surgery on plaintiff's nasal deviation on October 29, 2008. *Id. at p. 17.* On October 31, 2008, approximately one year after his release, plaintiff was examined by Dr. Theodore Knatt, a board certified orthopedic surgeon. Dr. Knatt agreed with Dr. Metoyer's treatment of plaintiff's wrist with anti-inflammatory medication. *Id. at p. 85*. As to plaintiff's ankle, Dr. Knatt opined that he would have recommended a different course of treatment for plaintiff's ankle fracture than that provided by UMC and Dr. Metoyer, however, he did not feel that the treatment was inappropriate or fell below that which was required. *R. 108, Depo. of Dr. Knatt, pp. 86-97.*

On March 10, 2009, the Court ordered plaintiff to file an outline of his claims "in order to clarify plaintiff's allegations, so that appropriate discovery and motions could be pursued." *R. 84*. Thereafter on May 21, 2009, pursuant to the Court's order, plaintiff filed an amended complaint setting out his claims as previously outlined. *R. 112*. In his Third

---

[6] The record does not reveal the actual date on which plaintiff was released from the St. Landry Parish Jail.

Amended Complaint, plaintiff alleges that Sheriff Guidroz and Warden Moore violated his due process rights provided by the Fourteenth Amendment of the United States Constitution. *Id.* Defendants, filed the motion *sub judice* asserting that all of plaintiff's claims should be dismissed under Rule 56 of the Federal Rules of Civil Procedure. *R. 108.* Twenty (20) days after plaintiff's opposition to defendants' motion was due[7], plaintiff filed a motion for extension of time to file his opposition to defendants' motion for summary judgment and contemporaneously filed his proposed Opposition. *R. 122.* Defendants filed a motion to strike plaintiff's Opposition as untimely. *R. 125.* The Court admonishes counsel for plaintiff that the deadlines established by the Scheduling Order are to be strictly adhered to and deviation therefrom in any future proceedings before the Court may result in appropriate sanctions. As the Court's consideration of plaintiff's opposition memorandum will not prejudice defendants, the Court chooses not to place the "sins of the lawyer" on his client and plaintiff's untimely motion to file his opposition will be granted and defendants' motion to strike will be denied.

## II. Summary Judgment Standard

A motion for summary judgment shall be granted if the pleadings, depositions and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) (*en banc*). Initially, the party moving for summary judgment must demonstrate the absence of any genuine issues of material fact. When a party

---

[7] The deadline established by Local Rule 7.5W to respond to defendants' motion for summary judgment is 15 days.

seeking summary judgment bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if such evidence were uncontroverted at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim. *Id*. If the moving party fails to carry this burden, his motion must be denied. If he succeeds, however, the burden shifts to the non-moving party to show that there is a genuine issue for trial.[8] *Id*. at 322-23. Once the burden shifts to the respondent, he must direct the attention of the court to evidence in the record and set forth specific facts sufficient to establish that there is a genuine issue of material fact requiring a trial. *Celotex Corp.*, 477 U.S. at 324; Fed.R.Civ.Pro. 56(e). The responding party may not rest on mere allegations or denials of the adverse party's pleadings as a means of establishing a genuine issue worthy of trial, but must demonstrate by affidavit or other admissible evidence that there are genuine issues of material fact or law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 (1970); *Little*, 37 F.3d at 1075. There must be sufficient evidence favoring the non-moving party to support a verdict for that party. *Anderson*, 477 U.S. at 249; *Wood v. Houston Belt & Terminal Ry.*, 958 F.2d 95, 97 (5th Cir. 1992). There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving

---

[8] Where the nonmoving party has the burden of proof at trial, the moving party does not have to produce evidence which would negate the existence of material facts. It meets its burden by simply pointing out the absence of evidence supporting the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. To oppose the summary judgment motion successfully, the non-moving party must then be able to establish elements essential to its case on which it will bear the burden of proof at trial. A complete failure of proof by the nonmoving party of these essential elements renders all other facts immaterial. *Id.* at 322.

party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

If no issue of fact is presented and if the mover is entitled to judgment as a matter of law, the court is required to render the judgment prayed for. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 322. Before it can find that there are no genuine issues of material fact, however, the court must be satisfied that no reasonable trier of fact could have found for the non-moving party. *Id.*

### III. Analysis

Plaintiff makes the following specific allegations related to his confinement at the Jail[9]: (1) defendants' failure to administer immediate medical treatment to plaintiff and to protect him from violence by other prisoners was a violation of his rights; (2) defendants' alleged acts were contrary to their duty and policy/custom to assume responsibility for plaintiff's safety and well being; and, (3) as a result of defendants' alleged acts, plaintiff is entitled to compensation for his injuries pursuant to 42 U.S.C. § 1983.

Defendants assert that: (1) plaintiff has failed to establish any evidence that they acted with deliberate indifference, and they are entitled to qualified immunity; (2) any of the alleged wrongful conduct by any of the defendants was not part of any official policy, custom or procedure; and (3) there can be no liability under State law as they did not deny plaintiff any medical care that was medically necessary. *R. 108.* Each issue will be addressed in turn.

---

[9] Plaintiff was a pretrial detainee during at least part of the time period on which he bases his claims. In *Hare v. City of Corinth*, 74 F.3d 633 (5th Cir.1996), the Fifth Circuit held "that the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement." *Id*. at 650. Thus, regardless whether the inmate is a pretrial detainee or a convicted prisoner, the standard of liability is the same for episodic acts or omissions of jail officials that expose an inmate to being harmed by another inmate. *Hamilton v. Lyons*, 74 F.3d 99, 104 n. 3 (5th Cir.1996); *Hare*, 74 F.3d at 650.

*A. § 1983 Deliberate Indifference*

"Section 1983 provides a private cause of action against those who, under color of law, deprive a citizen of the United States of 'any rights, privileges, or immunities secured by the Constitution and laws.' 42 U.S.C. § 1983. Claims under § 1983 may be brought against persons in their individual or official capacity, or against a governmental entity. *See Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997). Personal-capacity suits seek to impose liability upon a government official as an individual while official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' *Monell v. Dept. of Soc. Serv.'s of City of New York*, 436 U.S. 658, 690 n. 55 (1978). Thus, 'an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity.' *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)." *Goodman v. Harris County,* 571 F.3d 388, 394-395 (5th Cir. 2009).

Qualified immunity provides government officials performing discretionary functions with a shield against civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Easter v. Powell*, 467 F.3d 459, 462 (5th Cir. 2006). In determining whether an official enjoys immunity, the court must first determine whether, under current constitutional standards, the plaintiff has alleged a violation of a clearly established constitutional right. *Id*. If the Court determines that the plaintiff has fulfilled this standard, the Court must then determine if the defendant's conduct was objectively reasonable in light of the clearly established law at the time of the incident. *Id.* "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense."

*McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir.2002)(en banc).

The constitutional right at issue in this case is plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. As to plaintiff's medical treatment allegations, the cruel and unusual punishment clause allows an inmate to obtain relief after being denied medical care if he proves that there was a "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference requires a showing that defendants (1) were "aware of facts from which an inference of excessive risk to the prisoner's health or safety could be drawn," and (2) that they "actually drew an inference that such potential for harm existed." *Herman v. Holiday*, 238 F.3d 660, 663 (5th Cir. 2001). Such a showing requires evidence that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would evince a wonton disregard for any serious medical needs." *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Estelle*, 429 U.S. at 107). A prisoner's disagreement with his medical treatment is not actionable under §1983 absent exceptional circumstances. *See Bias v. Woods*, 288 Fed. Appx. 158, 161 (5th Cir. 2008).

Plaintiff also claims that defendants failed to protect him from being attacked by other inmates. "To establish a failure-to-protect claim, 'the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm' and that the prison official acted with "deliberate indifference" to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). A prison official acts with deliberate indifference if he 'knows of and disregards an excessive risk to inmate health or safety'-that is, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk

11

of serious harm exists, and he must also draw the inference.' *Id*. at 837. A prisoner alleging an Eighth Amendment violation need not show that prison officials believed that harm would actually occur-"it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842. A prison official's knowledge of the risk "can be proven through circumstantial evidence, such as by showing that the risk was so obvious that the official must have known about it." *Johnson v. Johnson*, 385 F.3d 503, 524 (5th Cir.2004). A prison official, however, may avoid liability if he "responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844. Furthermore, the mere negligent failure to protect a prisoner from assault does not comprise a constitutional violation. *See Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986); Oliver v. Collins, 914 F.2d 56, 60 (5th Cir.1990)." *Hinojosa v. Johnson,* 277 Fed.Appx. 370, 374, (5th Cir. 2008).

*1. Tammy Prudhomme in Her Individual Capacity*

Plaintiff alleges claims in his Original Complaint against defendant Tammy Prudhomme as "Head Nurse and/or Nurse and/or Medical facilitator of the St. Landry Jail ...." *R. 1, ¶ e.* In his Third Amended Complaint and his opposition to summary judgment, plaintiff makes no allegations concerning Prudhomme. Nor does plaintiff dispute that Prudhomme was only an LPN or staff nurse and had no supervisory nor policy making capacity. *R. 108, Deposition of Prudhomme, pp. 9-10.*

Plaintiff's medical records indicate that Prudhomme's contacts with plaintiff were on September 11 and October 18, 2007, dates on which plaintiff complained he had not been given his medicine. On both occasions, Prudhomme explained to plaintiff that he had no

remaining refills on his Ibuprofen prescription as ordered by Dr. Metoyer.[10] *R. 108-4.* The records further indicate that on September 11 Prudhomme placed plaintiff on the list to see Dr. Metoyer on his next weekly visit to the Jail. *Id., Deposition of Dr. Metoyer, pp. 50-51.* The record contains no indication that Prudhomme denied medical treatment to plaintiff.

*2. Warden Calvin Moore in His Individual Capacity*

Plaintiff alleges that on February 18, 2007, Warden Moore, acted with deliberate indifference in the protection of plaintiff when Moore knew about a rumor that plaintiff called another inmate a derogatory name which lead to inmates subsequently beating plaintiff upon returning to his cell from visiting hours. In particular, plaintiff alleges that while plaintiff was out of the cell block during visiting hours a "black inmate circulated a rumor that plaintiff, (white) called him a 'nigger.'" Even though the jailers had heard about the rumor, they returned plaintiff to the cell block "full of offended black men" who began beating plaintiff. *R. 110-3, Third Amded. Cmplt., ¶ 39-41.* Plaintiff alleges that he needed medical assistance after he was attacked, but Moore refused him immediate treatment and instead put him in solitary confinement. *Id.; R. 120.* Plaintiff also contends that Moore acted deliberately indifferent when he made the decision to not provide transportation for plaintiff to and from appointments with an orthopedic surgeon.

Moore testified that his only contact with plaintiff was the day after the "big disturbance" when plaintiff called some of the visitors and inmates "niggers." *R. 108, Depo. of Moore, p. 9-14.* Moore further testified that he took preventative measures to avoid harm to plaintiff by placing him in "protective custody" because the majority of the inmates were

---

[10] Defendants cite Prudhomme's February 26, 2009 Deposition in support of its representations, however, the pages cited do not correlate to that portion of Prudhomme's testimony listed as Defendants' Exhibit 1.

13

black. *Id. at p. 16.* In "protective custody," all of plaintiff's privileges were maintained, except that he was not allowed in the day room with the general population for plaintiff's protection. *Id.* Thus, the record indicates that Moore did not act or fail to act with deliberate indifference, but in fact reacted in a reasonable manner in response to the prior altercation.

As to plaintiff's allegations that his medical care was delayed by Moore, any such claims are belied by the record. Plaintiff requested medical attention on February 20 and was examined and x-rayed by Dr. Metoyer on February 23. Subsequently, every time plaintiff requested medical treatment, his request was fulfilled and he was examined on multiple occasions by Dr. Metoyer. Further, the Ibuprofen prescribed by Dr. Metoyer was consistently dispensed to plaintiff. As to Moore's alleged failure to provide him transportation to the orthopedist at UMC, plaintiff's appointments on April 4 and 25 were cancelled because of the Jail RN's failure to complete the paperwork and because the date received from UMC conflicted with previously scheduled events at the Jail. After UMC failed to reschedule plaintiff's April 25 appointment, on September 13, the Jail nurse rescheduled the appointment immediately following plaintiff's complaint that his appointment had not been rescheduled. During the time plaintiff's appointment was being rescheduled, Dr. Metoyer continued to examine plaintiff's ankle. *R. 108, Depo. of Dr. Metoyer, pp. 50-51.* Dr. Metoyer found that the ankle was doing well and did not see the need for additional treatment but believed that plaintiff should be seen at the UMC Orthopedic Clinic, just to be on the safe side. *Id.* Eventually, Dr. Metoyer changed plaintiff's medication to Tylenol because he didn't find anything that warranted additional medical attention to the ankle. *Id. at p. 53.*

### *3. Sheriff Bobby Guidroz in His Individual Capacity*

Plaintiff alleges that Sheriff Guidroz knew of plaintiff's medical needs following his altercation with the black inmates because plaintiff's father, Tilly Savoy, called and spoke with Sheriff Guidroz on or about February 18, 2007, the day of the alleged incident. *R. 120, Stmt. 26, Depo. of Tilly Savoy, pp 44-49*. The February 17, 2009 deposition of Tilly Savoy provides that he "called [Guidroz] at 8:10 p.m. Sunday night [February 18]." At that time, Guidroz told Savoy "there was an altercation and a slightly swollen ankle. Says he's still moving around." *R. 120-9, p. 44*. The record indicates that plaintiff was examined by Dr. Metoyer on Friday, February 23, the date Dr. Metoyer was scheduled to visit the Jail. Dr. Metoyer assessed the ankle fracture as minor and ordered x-rays of his hand and ankle. On March 4, 2007, plaintiff was sent to UMC.

Plaintiff contends that he filed a grievance with Sheriff Guidroz before March 3, 2007, complaining that he was not getting medical care. The record indicates that on February 19, plaintiff filed a Grievance Report stating that his request to go to the hospital after the altercation was refused. *R. 120-2, Exh. 1, St. Landry Parish Jail Record, Bates No. 2*. Contrary to plaintiff's contentions, the report further indicates that plaintiff was "scheduled for [a] hospital trip" and that "Sgt. V. Chavin will be handling the trip." *Id*.

Plaintiff has not presented sufficient evidence to demonstrate that any of the defendants, Tammy Prudhomme, Warden Moore or Sheriff Guidroz, was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that any prison official actually drew the inference. *Easter*, 467 F.3d at 463. Mere negligence, neglect, medical malpractice, and unsuccessful medical treatment do not give rise to a § 1983 action. *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir .1991). Accordingly, the actions

of defendants do not amount to deliberate indifference under well settled jurisprudence and plaintiff has failed to demonstrate that defendants violated his constitutional rights under the Eighth Amendment and has failed to provide the Court with evidence that demonstrates a wonton disregard for his "serious medical needs."

### 4. *Tammy Prudhomme, Warden Moore and Sheriff Guidroz, In Their Official Capacities*

Plaintiff alleges that Moore and Guidroz implemented a policy of allowing jailers to decide who gets medical attention. Plaintiff also alleges that Guidroz implemented a policy of allowing an inmate to be returned to his cell block even when a racial slur incident would make him a target for attack. Plaintiff makes no allegations against Tammy Prudhomme and does not dispute defendants' representation that Prudhomme was not a final policymaker.

"In a § 1983 claim for failure to supervise or train, the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference. For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. To establish deliberate indifference, a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation. Where a plaintiff fails to establish deliberate indifference, the court need not address the other two prongs of supervisor liability. Furthermore, for a supervisor to be liable for failure to train, the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform.

16

Moreover, for liability to attach based on an inadequate training claim, a plaintiff must allege with specificity how a particular training program is defective." *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009) (internal citations omitted).

As plaintiff's § 1983 claim fails because he has not shown deliberate indifference against defendants Prudhomme, Moore and Guidroz, the Court need not discuss the remaining prongs of supervisor liability.[11] *Goodman* at 395. For the same reason, an analysis of defendants' defense of qualified immunity is unnecessary. Qualified immunity is only applicable as a protective shield once a plaintiff has made out a claim against an official acting in his individual capacity. *Id.* at 396.

### B. State Law Claims

In his Original Complaint, plaintiff alleges that defendants actions constituted negligence under La. Civ. Code art. 2315. Louisiana state courts recognize a four-part duty/risk analysis test in determining whether a party is negligent under state law. *Mart v. Hill*, 505 So.2d 1120, 1122 (La.1987). Under the duty/risk analysis, a court determines (1) whether defendant owed plaintiff a duty of care, (2) whether defendant breached that duty of care, (3) whether the conduct in question was the cause in fact of plaintiff's injuries, and (4) whether the conduct in question was the proximate cause of plaintiff's injuries. *Id.*

Under Louisiana law, prison authorities owe a duty to inmates to provide reasonable medical care. *Corley v. Prator*, 290 Fed.Appx. 749, 753 (5th Cir. 2008) (citing *Harper v. Goodwin*, 930 So.2d 1160, 1163 (La.App.2006)). Thus, the first element of the test is

---

[11] Even assuming *arguendo* that plaintiff could show deliberate indifference against defendants, plaintiff has failed to point to any evidence with respect to training deficiencies and only speculates as to the supposed policy or custom allegedly implemented. As plaintiff has not alleged with specificity how any training program is defective, his claims against defendants in their official capacities would be dismissed. *Id.*

17

satisfied. Plaintiff, however, fails to prove the second element of the test for negligence as the Court has found that defendants' actions in this case were reasonable. The record evidence indicates that plaintiff was promptly treated for the symptoms of which he complained and was examined numerous times by doctors and nurses. Dr. Gaffga, the ENT who performed surgery on plaintiff's nasal deviation on October 29, 2008, testified in his deposition that waiting to perform the surgery over 10 months after plaintiff's release from Jail, made no difference in the outcome. *R. 108, Depo. of Dr. Gaffga, pp. 12-30.* While Dr. Knatt, the orthopedic surgeon plaintiff saw nearly a year after his release from the Jail, opined that he would have recommended a different course of treatment for plaintiff's ankle fracture than that which was provided by UMC and Dr. Metoyer, he did not feel that the treatment provided to plaintiff was inappropriate or fell below what was required. *R. 108*, *Depo. of Dr. Knatt, pp. 86-97.* Because plaintiff has not shown that the defendants breached the duty of reasonable care they owed him, the defendants are not negligent under state law. Plaintiff's state law claims will therefore be dismissed.

## IV. CONCLUSION

The record reveals that defendants timely provided plaintiff with access to adequate medical attention, including prescription medications and numerous examinations and treatments by several nurses, the Jail physician, and an orthopedic specialist. Defendants' motion for summary judgment dismissing plaintiff's claims against them will therefore be granted.